All right, and I do want to, because I might forget, I mean, in advance, I do want to thank both counsel for being here and Mr. Parris, however, and we appreciate everyone always being here, but I want to say that we, when parties do things pro bono, which we do, the court does appreciate that because on difficult legal issues, it's helpful to the court to have pro bono counsel as well. So thank you for doing this matter pro bono, and that we, the court is appreciative, and I know I speak for my colleagues as well. All right, so, Ms. Stapleton, please state your appearance and go forward. Thank you, Judge Callahan, and may it please the court. Anna Stapleton of Paul Weiss, and it is my honor this morning to serve as court-appointed amicus in support of Appellant Arnaud Parris. I would like to reserve two minutes for rebuttal. All right, well, you watch your time, but this is an interesting case and has a lot of legal issues, so I suspect I'll give you the two minutes regardless, but we may have a number of questions for both of you. Thank you, Judge Callahan. The Fugitive Disentitlement Doctrine, first developed in the context of criminal appeals, imposes an exceptionally harsh sanction that must be disfavored in civil contexts, and particularly so in the context of litigation under the Hague Convention, a treaty among nations that lacks the backdrop of American common law. In light of that context, and under the particular circumstances of this case, dismissal of Mr. Parris' petition for return was reversible error. To begin with the particular circumstances of this case Counsel, can I ask you a question? Why is it the fact that he had a warrant issued, and I understand that it was not issued until after Mr. Parris had left. Why isn't that fact something that we can consider, that he's using the courts, even though there is this active warrant in Oregon? The warrant was issued not only after Mr. Parris had left the country, but also for conduct after he had already left the country. So it's a warrant based on his failure to appear at a remedial contempt hearing. That failure to appear, of course, happened because he was already in France and declined to return. It's, I think, not the fact that the court can't take that into account. It's simply that under this court's precedence, it doesn't render Mr. Parris a fugitive. So broadly speaking, a fugitive is someone who has fled or has hidden from the court's jurisdiction, and here Mr. Parris has done neither. As we've said, he left prior to the warrant being issued. Well, he took the children without, you know, contrary to the court's order. I mean, he wasn't exactly abiding by the court's order. Absolutely, Your Honor, and I'm certainly not here to condone that conduct. There's no question that he removed the children from Oregon contrary to the temporary restraining order. But I think the question is one of his fugitivity, and particularly his fugitivity at the time that the current litigation became pending. By that point, the children had returned to the United States, and I would point out that in the context of Hague Convention litigation, that was necessarily the case, right? The Federal District Court here would not have had jurisdiction to decide a Hague Convention petition for children who remained outside the country. And so the question is his fugitivity, as this court recognized in Tarabellion, his fugitivity at the time that this litigation became pending. At that point, the children are here, and he is only subject to a warrant that was issued, yes, before this case was filed, but after he had left the country. So she took the children back later, too? She did, Your Honor. So arguably, you know, both of them committed the same acts to have, I guess there's a saying in the law, possession is nine-tenths of the law, and it appears that both of these parents seem to think if they had the kids, that put them in a better position. That being aside, I'm a little bit curious about Mr. Parris already, didn't he already lose his first Hague Convention petition? So why isn't he precluded from filing this second one? Doesn't 22 U.S.C. section 9003G, the full faith and credit provision of ACARA, mean that the District of Oregon is bound by its earlier decision denying his first petition? In this circumstance, no, Your Honor. So Hague Convention petitions are specific to removals, and that petition was with regard to a prior allegedly wrongful removal or retention. In this circumstance, Mr. Parris is challenging new conduct. That is the removal of the children from France in 2024. So they voluntarily dismissed the appeal in front of the Ninth Circuit. I was just a little, I didn't really know, with prejudice. So what you're saying, that's different conduct, so it's not precluded? That's right, Your Honor. But both factually and legally, the subject of the two petitions is completely separate. I would also point out that Judge McShane's order on the first Hague Convention petition does specifically state that the children were to remain in Oregon through the 2022 to 2023 school year. So it's not clear, even if it had been, even if it was sort of relevant to questions of something akin to res judicata, it's not clear that that order would continue to have effect beyond 2023. So I think he, I'm sorry, I'll give it to you. He argues that the Fugitive Disentitlement Doctrine as an equitable doctrine cannot even apply to the Hague Convention proceedings. Do you agree with that? I think there's a Lozano case which is on tolling and talking about treaties and American equitable. What's your position on that? Our view is that that's a broader case, excuse me, a broader issue than this Court needs to resolve in order to resolve this case. And as amicus, I would say there are good reasons for the Court to hesitate before reaching so broadly. There are other contexts, for example, in the cases like Sasan and Pessin that the District Court relied on, where the circumstances would mean that dismissal under disentitlement doctrine would sort of be synergistic with the purposes and aims of the Hague Convention. And I think it would be worth reserving that question for a case in which it is necessary to decide. Here, the Court I think could assume, even assuming that disentitlement can ever apply in the Hague Convention context, the elements of disentitlement are not met here, and so dismissal was not warranted. All right. Judge Smith, I'm sorry. This of course is a most unusual case. You have an Oregon trial court that roughly a year on bringing back the children in contrast to a French decree that said the same thing there. The children are here now. You have a court of appeals from the state of Oregon that said that the trial court's action was not subject to the fugitive disentitlement doctrine. What does that mean? This is the court that supervises the one that issued the warrant. Does that invalidate the warrant in any way? What effect does it have? This is really an interesting situation. This is a very punitive doctrine, a very punitive doctrine, and Judge Aiken applied a First Circuit doctrine, which is contrary to our current doctrine. It seems like somebody put this all in a mixmaster and just stirred it around. In your view, I think you already answered my colleague's concept, we don't need to get the bigger question whether this doctrine can ever apply in the Hague context. But in your view, the judge, of course not intentionally, just got the law wrong and we need to reverse it for that reason. Is that your position? That's right, Your Honor. So the lower court's decision was legally erroneous for two reasons. In our view, a failure to consider whether Mr. Parris was indeed a fugitive under this court's precedence and the failure to account for the Hague Convention context. I would add to your point, Judge Smith, and I think to Judge Callahan's earlier point, this kind of circumstance of the dueling custody orders from courts of different nations is truly the heartland of the Hague Convention, right? And understanding that this has been a long and convoluted and burdensome process for the parties. I think the best road to resolution of those issues is adjudication of the Hague Convention petition on the merits. That is precisely what the district court would have to sort out on remand. And we would ask that should the court reverse, it would reverse and remand with instructions to adjudicate that petition. Let me, just as a, you know, since I'm a former trial judge in the state courts, and while family law was not my assignment, I did family law cases, so I think that these things do come up. So hypothetically assume that it's reversed and it goes back. I'm trying to see what as a practical matter. So if it says, all right, that Mr. Parris is not kicked out on that, then on that basis, that it's adjudicated there. I'm looking down the line and then I know that the district court previously, Mr. then is going to have a hearing, will have a hearing and decide the merits of the application. And then Mr. Parris is going to ask to appear remotely again because he's thinking in his mind, I'm thinking if he puts a toe in the courtroom and having been a former trial judge, that he's going into custody. He'll get remanded because there isn't, regardless of that doctrine, that he has an outstanding warrant of that court. So then he goes, so and the district court previously said you can't appear remotely, which I think it is within the discretion of a court to run proceedings in the way that they want to. And I could say people can't appear remotely or they can or whatever. However, I decide I want to handle a proceeding. So is then the next, so then that court's going to decide and can decide whether there's remote appearances or how that handles, right? And then what the legal issues are. Is that the practical way this works? For absolute clarity, Your Honor, so on remand, the petition would be before Judge Aiken and the federal district court. To my knowledge, Judge Aiken had not ruled on any request to appear remotely. The motion to dismiss was decided without a hearing. And so, of course, it would be up to Judge Aiken to make that decision in the context of adjudicating the petition. Forgive me, I'm not based in Oregon, but is Judge Aiken still sitting? I don't know. I believe so, Your Honor. I know she took at least senior status, but she's still sitting. We have a nod on the other side, but it doesn't really matter one way or the other. The federal district court will be there. That's right, Your Honor. Thank you. And to that point, the question of the adjudication of the petition, it's completely ordinary in the context of hate convention litigation for one party to be outside of the United States, right? Because the whole purpose is that somebody is seeking return of children to a foreign country. And so this court has recognized in QAILR that's not a particularly unusual circumstance. And so that's relevant also to the justifications of the disentitlement doctrine, questions like enforceability, inefficiency, abandonment. Again, the fact that Mr. Paris is outside of the country is completely ordinary in the context of this type of litigation. All right. Now, do my colleagues have any additional questions? So we've taken you significantly over. So I'll give you a minute to wrap up in your time of things you might want to say, and then I'll give you two minutes of rebuttal. I'm expanding the argument time just so that we can have our questions answered. Thank you. Thank you, Judge Callahan. And I think before sitting down for now, the one thing I would emphasize is I think there was a flavor of question about sort of federalism and the relationship between the federal district court proceedings here and the state court proceedings. That's another sort of circumstance that is routine in the Hague Convention context. It's something that this court dealt with quite directly in Holder v. Holder, where there was a question about staying federal court proceedings in light of California state court custody proceedings. And this court says, no, the Hague Convention litigation is separate and has to go forward under the terms of the treaty. And I would also emphasize to the extent that there is concern about the dignity of the state court proceedings, this court made clear in Mastro that disregard for the authority of a separate court is not sufficient reason to rise to the level of necessity. I know what Mastro says. I understand the precedent and sometimes we have to follow precedents that we may not agree with. I just think it's a little crazy that we give lesser weight to a decision for disregarding a state court order because it's not its own order. But I understand that that's the law. And it's not just an issue of state versus federal court. Of course, in Mastro, the court was addressing proceedings in a bankruptcy court that had been disregarded by the litigant there. And so I certainly don't mean to suggest that the state court sort of carries less weight. The problem when it comes to the idea of the dignity of the courts is that, of course, this court maintains its dignity by addressing cases, right, deciding cases, as the Supreme Court made clear in Degen. And here in the context of the Hay Convention, where there are clear directions in the Hay Convention that petitions are to be litigated promptly, particularly high importance on going forward with the adjudication when it comes to questions of mutual respect of the courts of the signatory countries. All right. Thank you for your argument. And you have two minutes on rebuttal. All right. Mr. Peres, you have three minutes. Thank you, Your Honor. When I left with the children, I was given approval by the federal authorities in San Francisco who reviews the Oregon order and considered it invalid. And the same thing went for the French consulate who checked with Washington if the order from Oregon was still valid or not. And they were told that it was invalid. So I only followed permission from the U.S. federal authorities and the French consular authorities before getting on the plane. As a matter of fact, I was accompanied by the federal authorities to board the plane with the children. If when I returned to France with the children, mother, so that it was in violation of U.S. law, she could have filed a Hague action. And it's free in France to do so. It's very fast. She didn't, which goes to say about the case about me removing the children in the same level that she removed the children from France. These are completely different stories to answer Your Honor's question from earlier. And I have evidence of that, of course, in the record. Regarding my request to do a de novo review in my pleadings, the reason is because it's been a year and a half since the children haven't been able to do even a single video call with me because mother is refusing them to do so. They haven't seen their French family for a year and a half. And irreparable harm is taking place. And the only way to prevent it is to do a de novo review from this court. Otherwise, it would take a lot more time hurting the children to go into a court and be remanded. Monaski and Abbott, as case law, show that de novo review is possible in a Hague case. And Your Honor could do that here. If the court wants to expedite things about the illegal removal from France, since there is already a finding that France was a habitual residence from a federal judge, as mentioned earlier, Judge McShane, this honorable court is 15 of the Hague Convention to ask that directly to France. And France would have to answer the question whether it was removed in violation of French law and French soil, which is the only question left in front of this court if this court accepts to remand the case or to consider the case de novo review. Five days before the abduction, I was in front of the appeal court of Paris with mother, who assured the judge that she would never dare to take the children outside of France. And she did five days later. But the judge asked us to do a mediation. And two days before abducting the children, she was in a mediation with me. And I agreed to give full custody, sorry, shared custody to mother three months of the year in France with an apartment free, and three months to go and see the grandparents in Oregon, which means mother could have shared 50-50 custody in France if the children are returned by this honorable court. There is a new French appeal judgment who's asking the same thing. And please consider the French new judgment as part of the record, because this would show the court that France wants both parents in the life of these children, and so do I. All right, you have 11 seconds. So if you want to wrap up, you don't have to lose. Otherwise, I'll give the 11 seconds to your pro bono lawyer. Oh, you're over. I'm sorry, you're over. It's the red light. I read it wrong. Okay, so thank you for your comments. And so I'm going to listen to the other side. We'll listen to the other side. And then your pro bono lawyer will handle rebuttal. Thank you. All right. Good morning. Good morning, Your Honor. Katrina Seifel is my name, and I represent Appellee Heidi Brown. May it please the court, Mr. Parris, and counsel. This case is about a man who seeks an equitable remedy in a United States court pursuant to the Hague Convention, when he refuses to equitably litigate intertwined cases in other courts of this country. The district court granted mother's motion to dismiss pursuant to the fugitive disentitlement doctrine, and this court may only reverse now if it finds that the district court abused its discretion. Well, hold on. I mean, one of the things I think, and I think Judge Smith mentioned this, is that the state court had the opportunity to apply a similar doctrine. It's not necessarily the disentitlement doctrine. I think it's pursuant to Pruitt under state law. And they chose not to do that. Why should we now, in federal court, apply the very doctrine that the state court itself decided not to apply? Well, they're different analysis in state court and this federal court. What I can say, Your Honor, is that it's my understanding that there have been countless proceedings, lawsuits, between Mr. Parris and Ms. Brown since this Hague petition was filed. While one of them may not have been dismissed pursuant to this similar doctrine, a number of others have been dismissed pursuant to this doctrine. Wait a minute. Did I understand that there have been several cases involving this where the fugitive entitlement doctrine has been brought up? That's correct, Your Honor. And in the record, what are those cases? Well, they're cases between Ms. Brown and Mr. Parris in state court. I don't have the specific numbers. I would be happy to submit them via letter to this court following this argument. I cannot say definitively what is in the record because many of them have happened since the petition was filed. Well, forgive me. Are you just saying it's part of the same proceeding the motions were made about the fugitive entitlement doctrine, but it's part of the same case? It's all over their kids, the custody of their children. It's not a whole bunch of different cases, right? Well, they're all intertwined. So Mr. Parris moved to register the French judgment in Oregon. That case was dismissed, appealed. I believe that one was dismissed pursuant to this doctrine. He then filed a new case seeking to register the French judgment in Oregon state court. So in that respect, it's the same, but it has a new case number. All right. But we're all talking in state court, they're fighting over the custody of their children. Correct. All right. Correct. So do other contracting parties to the Hague Convention recognize the fugitive disentitlement doctrine? I mean, I was looking at Lozano when it's talking about tolling and they're saying, you know, the Hague Convention is a bunch of countries that agree to a treaty. And the fugitive disentitlement is a very specifically American common law, right? Correct. And in Lozano, I think for a majority, Justice Thomas wrote that we don't import American common law concepts and put them on interpreting all these parties that never agreed to it. I understand the question, Your Honor. What I can say is I don't know of another treaty partner signatory that recognizes something like the fugitive disentitlement doctrine. But what I can say is that our other circuits in this country recognize it. And specifically, Mr. Parris recently brought to the Court's attention the case of Carpengo v. Leendertz, where the Third Circuit determined that the equitable doctrine of unclean hands does not apply to a Hague Convention case. But the Court in that case specifically footnoted that it is okay and it is warranted for the fugitive disentitlement doctrine to be applied in Hague Convention cases when warranted. Well, okay, but didn't Ms. Brown take the children out of France after the French Court's rule that neither parent could take the children to? So wouldn't she be a fugitive in France? No, Your Honor. She took the children out of France in accordance with the Oregon State Judgment. All right, but what did the French Court say? The French Court said that both parties have joint custody to determine where these children... Did she have permission to take the children in the French Court? She did not seek permission. She was not prohibited from doing so, is my understanding. That's contrary to what Mr. Brown just said. You're saying he's wrong? I am. Okay. Yes. Now, the case of Carpengo v. Leendertz, as I was saying, they specifically footnoted that it is okay to apply this equitable doctrine in these Hague when we're talking about equity. The fugitive disentitlement doctrine should not be applied to the Hague Convention because it undermines the very purpose of the Hague Convention. Well, but ACARA provides that Congress recognizes the need for uniform international interpretation of the convention. And if other countries don't recognize the fugitive entitlement doctrine, wouldn't it be, wouldn't its application be in violation of ACARA? I wouldn't say it would be in violation of ACARA because there's, not that I am aware of, cases, law in other countries that says it would be error to apply the fugitive disentitlement doctrine. Let me ask you this. Judge Aiken applied Walsh v. Walsh, a First Circuit case. Terrabellum, our case is different. Do you agree that Terrabellum is the controlling law in our jurisdiction? I do believe that Terrabellum is the controlling law. Well, I have one of the people on Terrabellum sitting right here, so. Indeed. So if that's the case, how do you square the application of the doctrine, in this case, applying Terrabellum? Because the district court, despite not specifically applying Terrabellum, still applied the factors of Terrabellum. How can you say that? Well, the factors of Terrabellum, and factor number one, pertains to whether the case is civil or criminal. And you agree this is civil, right? It's not criminal. I agree, absolutely. And the district court noted as much in its opinion, and specifically citing to Deegan and Mastro, said that I am only dismissing this case as a matter of necessity. It's necessary to effectuate the underlying concerns of the doctrine. As to factor number two of Terrabellum, pertains to Mr. Parris's fugitive status. The district court directly addressed this factor on page nine of its opinion. Now, Amicus. Now, when he took the kids, I understood him to say, at customs here, he got, in the United States, he got questioned. But they let him go. They were convinced he could take them. And when in France, that same thing went on. But did he have the outstanding warrant when he took the kids? He did not, when he took the kids. It was issued after he took the kids. All right. What effect does that have? And I think Amicus' counsel said that's an important factor. Right. So, Amicus and Mr. Parris both argue that he's not a fugitive because he left the country and the warrant was issued after he left. I filed a letter with this court yesterday, directing the court's attention to the case of United States versus $671.160 in U.S. currency. And the same argument was made in that case that Mr. Parris makes here. That someone who's in a jurisdiction of the United States, then lawfully returns to their home country, and then thereafter is subject to a criminal case or a warrant, is not a fugitive. But the court in that case, this court, the Ninth Circuit, made abundantly clear that a person is still a fugitive if, while they are legally outside the grounds of the United States and then become subject to a criminal case or a warrant, they decide not to return to the U.S. to face that pending charge, to face that pending warrant. That's a criminal case, right? Does that matter? I don't believe it does matter, no, because it still pertains to the fugitive disentitlement doctrine and the consideration of fugitive. And that's what we're talking about here, Mr. Parris. But with respect, you're a good lawyer. We're talking about children here. Correct. This is not a bunch of thugs. These are people concerned about their children. And it just seems startling to me that even though you can define what happened here, that he is a fugitive, he'd left the country. He's a father who wants to be with his children. The mother wants to be with her children. It's a divorce family law kind of a thing. And the whole concept of the fugitive disentitlement doctrine is to not let the thugs and the bad people get away with this stuff. This is quite different, is it not? It's different, Your Honor, yes. But what I can say is that the Hague Convention was enacted to address wrongful removal of children from a country that the children were rightfully located in to begin with. And here, Mr. Parris left the country in violation of a court order with the children that resulted in a warrant for his arrest. A year later. These children are citizens of both countries, correct? Correct. And before the parents went sideways and decided to split up, these children have lived both in the United States and France, right? Correct.  I'm over my time. No, keep going. Well, I think as long as we have questions, we're going to keep going. You were going through the considerations of the district court as it pertains to, in your view, the law on the disentitlement doctrine. And you were going to go, could you address the third factor and how the district court dealt with that? Because I'm not so sure that that factor might be in your favor. Certainly. Or may not, actually, in your favor. So the third factor of Terrabellion pertains to whether the traditional justifications of abandonment, deterrence, dignity of the courts, efficiency, and enforceability support dismissal. And what I want to note about this is that when Terrabellion declares this third factor, the court cites to Deegan. And I think that's important to note because the district court, when issuing its opinion, specifically cited to Deegan. And that's beginning on page 12 of the opinion. Now, the district court talked about Mr. Paris's disdain for Oregon courts, but also noted that in line with Deegan was not going to specifically consider that in making its ruling. The court in Terrabellion. I guess I need to understand, what was that based on, the disdain for him requesting to appear remotely? Or I don't understand that. It was for a number of things. Disregarding the, I'm sorry, the state court's orders to appear in person. Disregarding the state court's orders to return to Oregon. That was the whole thing. That's what, that's the whole thing, that he didn't return. And there was a reason for that. But when it boils right down to it, the third factor was that. So that's what I wrestle with. I mean, and you have to look at the totality of the circumstances, of course, as well. And again, it's just this, this is not a bunch of thugs. It's your parents. And you're dealing with equitable, important, personal issues here. And the idea that someone would be unable to respond, with respect, in this case, to his children, seems quite contrary to what the Hague Convention was intended to do. Help me with that. What am I missing? Mr. Paris would be able to respond if he availed himself of the other courts in this country. Well, but first, the Hague Convention says who's going to decide, right? Correct. And he got kicked out by using the fugitive disentitlement doctrine. That never was decided. Now, we don't know what, if we reversed, because we said that Terrabellum on the third factor, that you're not right, let's say, it would go back. That doesn't mean he wins. It means that whatever district judge is going to decide, who gets to decide custody of these children, right? That's correct, Your Honor. And neither of these parents will be free of their behavior when, whether it's a judge in France, whether it's a judge in Oregon, or whatever, they're both going to be held to account to what is, you know, what's in the best interest of the children and who will obey court orders. That's correct. Okay. But you want to just kick him out before a court even decides where the right place is. And that's based on because he didn't, he took a warrant issued after, and then he won't show up now, right? Not based solely on the warrant, but based off of his wrongful acts that led to the warrant. Again, I'll revert to that the Hague Convention is meant to enforce the wrongful removal of children from a country that they are rightfully in to begin with. Your colleague acknowledged that Ms. Brown prevailed in the first Hague case that Mr. Paris brought against her. After that, the Oregon State Court, the parties were in the middle of litigating and said, neither of you are allowed to remove these children from Oregon. And then Mr. Paris did just that. The children were never rightfully in France because Mr. Paris wrongfully removed them in violation of the court order. So it's not just about... Well, and if after reviewing this, the judge says custody should be decided in Oregon and any family law judge that decides that and decides what visitation is, what custody is, all of those things can take into consideration the conduct of both parties at that time and what, and you know, and actually the best interest of the children, which I don't know, they both have ideas about what they think the best interest of the children is, but that's why a court gets to decide that because as Judge Smith says, both of these parents want to see their children. They want to, and as a practical matter, that we know that the parent, wherever the children live, that parent is going to see the children more just by virtue of that. Yes, absolutely. So that's what they're fighting about. But the thing is in terms of, are they thugs? Are they people that are laundering money? Are they people that are, you know, committing terrible crimes? They're not. They're two people that are fighting over their kids, which anyone that's done family law would not find that the fact that they don't agree on who gets more to see the kids or where the kids grow up. This is not a new concept. I agree, Your Honor. Any other questions? All right. We've gone over sort of about the same amount of time. I appreciate your comments. Okay. There are two minutes for rebuttal for amicus counsel. Thank you, Judge Callahan. Three quick points. First, regarding the currency case that was in the 28-J letter yesterday. I want to be clear, that case is in a legally different posture and context. It is applying what is called the Fugitive Disentitlement Statute. That's 28 USC 2466. And it's a statute that got enacted after Deggan specifically to address the issue of fugitives from criminal cases seeking civil forfeiture remedies. So that statutory context does not apply here. And it's important because the statute provides the specific definition of fugitive that my colleague referred to. So that is not controlling here. I would add that the factual circumstances are different. That is a circumstance where someone was sort of running around committing criminal conduct in the United States and then flees the jurisdiction before an indictment can be entered. That's different than what occurred here. So I understand your argument for, even though I think that Mr. Parris would argue more broadly, but your argument is that under the Terriblean, under the third that the court aired, and it should go back for that and then have the district court decide that. You cautioned the court about going further. I'm just curious why if the Fugitive Disenfranchisement and Disentitlement Doctrine were said to not apply to the Hague Conventions, what is the parade of horribles if we said that? Your Honor, to be clear, my caution is only that that complete analysis has not been done here. The court referred to the analysis in Lozano. Questions about how other signatory nations treat this circumstance, we're just not aware. And I would add also that in Lozano, the Supreme Court was aided by having the views of the United States, which I think could potentially be helpful to this Court's decision on that broader question. In terms, it's not quite a parade of horribles, but I do think I keep in mind that the circumstances present in Sasan and in Pessin, where there is an adverse adjudication on the Hague Convention proceeding in a lower court, and then the losing parent takes the kids and runs while trying to appeal that judgment. And in that circumstance, dismissal of the appeal is, as I said before, sort of synergistic with the purposes of the Hague Convention in terms of seeking to prevent abduction and enforcing sort of mutual respect among the courts of the different nations. And here there was no actual decision below is what you're saying? That's right. Here, the lower court has not adjudicated the Hague Convention petition, and that actually leads me to my second point. My colleague multiple times referenced the idea that Mr. Paris's removal of the children from Oregon to France was wrongful in the first instance. Wrongful removal in the context of the Hague Convention is a term of art. The Court has to look to the habitual residents of the children. There was an order saying no one takes the kids. There was a temporary restraining order. And so your client, as amicus regardless of how we want to refer to it, I'm not sure he's exactly correct. Just because he got through customs doesn't mean that if someone had been there with an order you can't remove the children, they might not have let him take it. And my only point here respectfully, Judge Callahan, is that the question of whether there was a wrongful removal for purposes of the Hague Convention is one that has not been adjudicated. It was not adjudicated as part of the motion to dismiss on fugitive disentitlement grounds. And so that would be part of the consideration on remand when the Court is in front of the District Court. Precisely. And then on my third point, you know, there's been a lot of discussion of Mr. Parris's disdain for the Oregon courts. I understand that there are also concerns about his behavior and treatment of both the State Court and potentially the District Court here as well. The Supreme Court has said, this Court has echoed, that dismissal under the disentitlement doctrine is simply too blunt a tool. The Federal District Court has other mechanisms to deal with vexatious litigants, with inappropriate behavior of litigants, and that does... I think that goes without speaking. If we decided cases on people that are nice to us or people that we like, we wouldn't be very good judges. So if, you know, our skin is a little thicker than it looks. We deal with, as I think that everyone can see here, we're dealing with legal issues. So the person we like the most or whatever, or the person that's the nicest to us, it might make the Court hearing nicer, but they don't win. The person with the legal arguments is the person that wins. That's right, Your Honor. And I think I would also, on that note, point to the District Court's discussion of the enforceability justification, because I think the language in that discussion does tilt a bit towards concerns about contempt for disdain for the State Court's judgments, rather than the sort of legally relevant question of whether an adverse decision on the Hague Convention petition would be enforceable against Mr. Paris. And it is our contention that, of course, it would be. The children are present in Oregon. Mr. Paris can't return to Oregon without having to confront the warrant out for his arrest. And so a decision on the petition that said, this is the children's country of habitual residence and the Oregon courts have jurisdiction to determine the custody proceedings would be enforceable against Mr. Paris. And that is simply, if I may say in summation, one of the many reasons why the Court's failure to adequately address the Hague Convention context here rises to the level of legal error that should be reversed. All right. Thank you both for your argument today. Thank you, Mr. Paris, for appearing remotely. This matter will stand submitted.
judges: CALLAHAN, SMITH, MENDOZA